## HOGAN *vs.* BELL, et ux.

1. Where slaves were, by the will of a testator, *lent* to a daughter, during her life, and on failure of heirs of her body, remainder to others; and afterwards, before the testator's death, the daughter married, and the slaves were occasionally in possession of herself and husband; it was held, that the terms of the bequest could not be defeated by the fact, that the slaves had thus gone into her possession, on marriage—and by setting up such fact, as a parol gift—it appearing that all parties, at the time, recognised the bequest and limitations by the will, and acquiesced therein.

2. In a case where a testator bequeathed slaves to his daughter for life, remainder (in the event of her having no issue of her body,) to the testator's four children—held, that the interest of the residuary legatees in the slaves, was assignable, in their lives; and descendible, on their decease, to their legal representatives.

3. To perfect the title of a husband to the choses in action of the wife, it is essential that during coverture, he reduce them into possession.

4. But where slaves were bequeathed to a testator's daughter, during life, with a limitation to her sister and brothers, in the event of her dying without heirs of her body; and a release of the contingent estate was afterwards made by two of the residuary legatees, to the daughter, and a third died during her lifetime, a minor—it was held, that the descent from the deceased brother, and the release of the interest of the two others, being valid, vested a sufficient possession in the husband of the daughter, to authorise a recovery by him of *that* portion of her estate in the slaves, so released, and claimed by descent.

In error, to the Circuit Court of Franklin.

This was a bill in chancery, to subject certain slaves in the possession of Hogan, to restitution— they being claimed by the complainants, under the will of Thomas B. Whitmell; and in right of Ann, wife of Bell, and the child of the testator.

The bill was filed in the name of Bell and Ann, formerly Ann Smith Whitmell, his wife, the said Bell being the administrator of Thomas West Whitmell, and of Elizabeth W. Hogan, formerly Elizabeth W. Whitmell,—heirs and devisees of Thomas Blount Whitmell, deceased. It stated, that on the 20th day of February, 1798, at Halifax, in the State of North Carolina, the said Thomas B. Whitmell made and executed his last will and testament, which contained a clause of the following effect, to wit: *Item*—I lend to my daughter, Elizabeth West Whitmell, six negroes, viz: Sam, Eli, Charity, Tempey, Louie and Molly, and their increase, during her natural life; and if my said daughter, Elizabeth West Whitmell, should leave an heir or heirs, lawfully begotton of her body, I then give to the said heir or heirs, so begotten, the said six negroes above named, and their increase, to them and their heirs forever; and for want of such heirs, my will and desire is, for the said above named six negroes, and their increase, to be equally divided amongst my four children, Thomas Whitmell, Drew Smith Whitmell, Ann Smith Whitmell, and Thomas West Whitmell, to them and their heirs forever."

That on the twentieth day of September, 1798, the said testator, Thomas B. Whitmell departed this life; and that afterwards, the aforesaid will was duly proven, and admitted to probate agreeably to the laws of North-Carolina. That subsequently to the

execution of the said will, but before the death of the testator, the said Elizabeth W. Whitmell intermarried with one Claudius David L: that during the marriage of said Claudius and Elizabeth, to-wit, on the twenty-fifth day of October, 1804, the said Thomas W. Whitmell, while yet a minor, died intestate, unmarried and without lawful heir of his body. That after the death of said Thomas W. Whitmell, and before the said Elizabeth David L, had any child or children, the said Claudius David L, died, also. That during the marriage of said Claudius and Elizabeth, to-wit, on the first day of October, 1813, the said Thomas Whitmell and the said Drew Smith Whitmell, executed to their sister Elizabeth, a certain deed of release in writing, in the words following, to-wit—" To all before whom these shall come, greeting. Know ye, that Thomas Blount Whitmell, late of Halifax County, deceased, by his last will and testament did lend unto his daughter Elizabeth West Whitmell, during her natural life, certain negroes, to-wit, one negro man named Sam, one named Eli, one boy named Louie, one woman named Molly, one named Charity, and one girl named Tempey—together with their increase : and that Thomas Blount Whitmell did devise in said will, that if his said daughter, Elizabeth W. Whitmell, should depart this life, without lawful heir, begotten of her body, that then the said negroes above mentioned should return to the heirs of the said Thomas Blount Whitmell—And know ye also, that the said Elizabeth, since this devise has been lawfully married unto Claudius David L; and removed with him, her said husband, to the State of Tennessee. And know ye also, that we,

HOGAN *vs.* BELL, et ux.

Thomas Whitmell and Drew S. Whitmell, being two of the lawful heirs of the said deceased; and unto whom a part of the said negroes will return at the death of our sister Elizabeth—without issue. And we therefore, for the natural love and affection which we have for our beloved sister, Elizabeth W. David L, do for ourselves, our heirs, &c., give, grant, and confirm, unto our said sister, Elizabeth, and unto her assigns, all our right, title and interest, which we may have, forever, hereafter, on or in the said negroes, or their increase, whatever; and we do by these presents for ourselves, our heirs, executors, &c., disannul any right, claim, or interest in said negroes, from this time and forever," &c. Witnessed, signed and sealed.

That after the death of the said Claudius, and during the widowhood of the said Elizabeth, the said Drew S. Whitmell departed this life, intestate and unmarried, and without having lawful heir of his body: and that subsequent to the death of said Drew S. Whitmell, the said Elizabeth David L, intermarried with Arthur S. Hogan. That after this last marriage, Thomas Whitmell departed this life, without issue: and that on the 26th day of October, 1824, the said Elizabeth W. Hogan, also died, without ever having issue of her body—leaving the said Ann Smith Bell, the wife of the complainant, the only survivor of the four contingent legatees above mentioned—*who with her husband, the complainant, in their own right, and through the said Bell, as administrator, as above set forth, were entitled to the before mentioned slaves, with their increase; and their hire, from the time of the death of the said Elizabeth W. Ho-*

4 s & p. 37

*gan*—they being in the possession of the said Arthur
S. Hogan, the defendant.

The bill further alleged, that the said Hogan, at
the time of his marriage with the said Elizabeth,
was in possession of the said negroes, and had full
knowledge of all the facts and circumstances con-
nected with the title; and that the said Elizabeth
had only a life estate in the same.

The answer of Arthur S. Hogan, the defendant,
admitted the charges in the bill as to the execution
of the will, and the death of Thomas B. Whitmell;
but insisted on proof of the will having been admit-
ted to probate: admitted also, the marriage of Eliz-
abeth W. Whitmell with Claudius David L, and the
death of Thomas W. Whitmell, while a minor, and
unmarried: also the death of Claudius David L,
without issue of the body of his wife Elizabeth—
the execution of the deed of release by Thomas and
Drew Smith Whitmell, the marriage of defendant
with Elizabeth, and her death: insisted that the ab-
solute property was vested in the said Elizabeth;
and claimed it, not only from the limitations in the
will of said Thomas B. Whitmell, but because the
said will had been made before the marriage of said
Elizabeth with the said Claudius; and to prevent
her marriage with another individual. It further
averred, that on the marriage of the said Elizabeth
with the said Claudius, the said six slaves named in
the bill, were sent home with the new married cou-
rle, the said Claudius having a house, to which he
removed: and contended generally that the slaves
had been given to the said Claudius and Elizabeth,

on their marriage : also, that said property had been willed by the said Claudius to his wife Elizabeth.

The following was the testimony (as condensed) taken in the cause.

Evidence for complainant.

*Ann Whitmell.*—She was the widow of testator, Whitmell ; in May, 1798, Elizabeth was married to C. David L ; before the marriage David L ; had been keeping a store four miles from Whitmell's ; after marriage he resided at Whitmell's, and commenced building a house for residence and store, two and a half miles from Whitmell's. In August she believed house not being done, David L sent a load of furniture to it, for use of workmen. Elizabeth was once at new house, but returned in evening ; did not believe they removed till after death of Thomas W ; and when they did, the house not finished, and they went into a log house near it ; believed the chimneys not built till Christmas, and five's battery not built for at least twelve months afterwards ; she often heard testator say before he made his will, that he intended to give only life estate to Elizabeth, and such she always understood to be the nature of his will, and such was also the understanding of Elizabeth and David L, after old man's death. Elizabeth complained of the injustice of limiting her estate ; that the six negroes remained in the possession and control of Thomas B. till his death ; that after the marriage, and before death, those, as well as other negroes of T. B. W, were occasionally in employ of David L, assisting in jobs, but that David L had no control over them till after death of T. B. W. ; that soon after death of T. B. W. she complained to Granberry, one of the exe-

cutors, of misbehavior of one of the slaves, to which he replied they had better be sent home to Claudius; that the crop might be got in by others without him; proved number of negroes and ages, &c.

*Wm. Alsobrook* heard demand of negroes by Bell, short time after Mrs. Hogan's death : negroes as valuable as any of the kind.

*Samuel Eggleston* lived with Hogan in 1824; proved value of negroes and their hire.

*George P. Eggleston*—value of negroes, and their hire.

*Elizabeth Powell*—knew the negroes, and knew them when in the possession of Mrs. David L, when she was a widow, and knew them from then till now. Mrs. David L, while a widow, said they were lent to her by her father; and that at her death they were to go to her family; she frequently said the same in Tennessee, in 1818 or 1819; she never heard Claudius David L speak about them. It was the general understanding in the neighborhood where David L lived, that the negroes were only loaned, and never heard any thing to the contrary. Henry Moran's character for veracity was good, and she never heard it impeached—never heard David L speak at all about the negroes—nor Mrs. Elizabeth, before old man's death. She said it was strange her father had only lent her property, when to the other children he had given it; and sometimes seemed to think hard of it; did not always complain of her father; always spoke of her title as derived through the will, &c.

*Elizabeth Barker* knew nothing about the title. In North-Carolina, it was the general report, that the negroes were only lent to Mrs. David L, for life,

HOGAN *vs.* BELL, et ux.

and she never heard any thing to the contrary; knew character of Moran thirteen years ago, and before that time; considered a man of truth, and stood fair; she is sixty years old. David L was said to be a Frenchman.

*Edmund Wiggins.*—Knew Henry Moran for twenty-six years previous to 1818, and since that time had corresponded with him; up to 1818 his character was good, and worthy of belief in a court of justice; had heard nothing against him since.

*Mary King.*—Became acquainted with the negroes and continued to be so, till they left the neighborhood ten years ago, in Dickson county, Tennessee; always understood the negroes belonged to David L during wife's life, and no longer; often heard David L and wife say, during life-time of C. David L, that the slaves were held under her father's will, and if she died without children, that they returned to wife's brothers and sisters. She recollected many conversations during life-time of C. David L, and with wife since his decease; Mrs. David L always said she held them under the will, and that the property would return to her brothers and sisters at her death, without children. C. David L often admitted the same, and expressed dissatisfaction at her father's will; said he was only working for other people. The general understanding of the neighborhood was the same. She knew of the increase of slaves till about nine years since—(stated the increase.) Mrs. David L told her that she never went to house-keeping till after the death of her father—that before, she went to David L's house, and remained there one night, but the house was so open, and she was so

unhappy during the night, that she returned home next morning, before breakfast, and remained there till her father's death; heard Mr. D. L say he was working for other people. Claudius David L was careful of his property: she did tell Bell that she knew nothing of the business, but at that time she did not know that declarations of David L and wife, were evidence.

*Henry Moran*—In February, 1798, wrote will at request of Whitmell, in which he lent negroes. In May, marriage took place; and in September, a very few days before death of Whitmell, he sent for him, to make alterations in will; "I expected it was concerning the loaned negroes, but when got there and was prepared to write, he said, the only alteration he wished made, was respecting some land which he owned in Tennessee; he wrote a codicil; after he wrote respecting the land, asked Whitmell, if he wished to make any alteration respecting the loaned negroes? he answered no, let that stand as it is. He read and signed the codicil, and a very few days after, expired; was intimately acquainted with Whitmell, and boarded with him two years, till January before his death, and generally did his writing, and then lived one mile off, till his death; never understood the negroes were given as a marriage portion; David L and wife moved home a few days after death of Whitmell; David L lived about one mile from Whitmell's. It was not till spring that new house was finished, so they could live in it, but they moved into a log house. Whitmell worked the negroes in the crop the year he died, and they helped gather the crop after death of Whitmell. Whitmell did not send the negroes home

with David L, but they were in his possession at and
after his death.   David L established a store at the
bridge in 1799, in spring, and the five battery was not
built till one or two years after that time.   Was well
acquainted with Jones and Sills, and dont believe
Whitmell was ever intimate with them.   Jones and
Hoggs married Drew Champion's sisters.   C. David
L admitted to him, that he knew that at his wife's
death his title was gone, but said he was not afraid
but she would have heirs.   After David L moved to
Tennessee, he returned to North Carolina, on busi-
ness, and asked opinion of witness, if he sold the ne-
groes and bought others, if they would not belong to
him—witness said they would, but that the heirs
would not permit him to do it: he said he could do it
and they would not know it.

*Milly Barrow*—Always understood the negroes
were loaned to Elizabeth.

*Mary Haynes*—Whitmell told her, he had made
his will, and what he had intended for Betsey, he had
lent her; on being asked why he did not give her her
part, as well as the others—he said, he did not know
what kind of a man she had married.   Elizabeth
was present at this conversation.   She was married
to David L.   If they stayed at Whitmell's till his
death, she did not know it.

*Alexander Frazier*—Knew Whitmell eight years
before his death; and David L, one year before mar-
riage, and as long as he lived afterwards there; lived
in one or one and a half miles of both; was intimate
with both, and often at their houses; set up with
Whitmell almost every night of his last illness.   Da-
vid L and wife did not finally move home to live, un-

til after death of Whitmell; knew the negroes; they went home to live after death of Whitmell, and after gathering the crop, they had gone to the place where David L settled before, with other hands, to clear the place up, but returned to Whitmell's to get in the crop, and did not go home to live till the crop was gathered, which was after Whitmell's death; saw some of the negroes at work in Whitmell's low-grounds, gathering crop, after Whitmell's death; the negroes worked in crop with other negroes of Whitmell, that year; never heard that David L and wife claimed otherwise than by the will; believes David L moved to Tennessee three or four years after marriage; moved to Tennessee with him; heard David L say, in Tennessee, and grumble, that he would lose the negroes, if wife died; and the same in North Carolina.

*Nicholas Bryant*—Was acquainted with testator, and C. David L; was related to Whitmell's family; David L moved into his new house about 1st December; before that, he lived at Edwards's ferry; knew Molly and negro man; knew Whitmell's negroes; David L did not take any of Whitmell's negroes home with him, as he knows of—would have known it, if he had; Whitmell worked all his hands in his crop that year, and they helped gather the crop before any of them went to David L's; Whitmell sent different hands to work occasionally, at house; different sets of hands; dont think Whitmell was ever at David L's; never saw him there; thinks he would have seen him if there; there was a coolness, soon after the marriage, between Whitmell and David L. It was always understood the negroes

were to return to the family; never heard that any negroes were given to Elizabeth, as a marriage portion.

Evidence for defendant.

*John Hogan*—Lived in North Carolina when David L married Elizabeth; David L commenced house keeping several months before the death of T. B. Whitmell; was at his house frequently, and recollects seeing some of the negroes; and saw them there frequently, before death of old Mr. Whitmell; they were reputed to be the property of C. David L, in that neighborhood, at that time; knows Mrs. Ann Whitmell; she is a very old woman, and lives with Bell. Mrs. Hogan died four or five years ago; negroes higher then than now; Charity has died since Mrs. Hogan's death. The marriage took place early in spring; was at wedding; and in a few weeks after, the couple moved home permanently; and witness went to board with them the next year thereafter.— At time of marriage, David L kept store; when they first moved after marriage, they lived in a log cabin, and sometime in the fall, they moved to the new house, as he believes; new house was not finished; David L cleared land, the year he was married; and the year he lived with him, he rented a plantation two miles off, not having cleared land enough, of his own; he had contiguous to his house, ten or twelve acres, which he commenced in the latter part of the summer or commencement of the fall of the year he was married. About the death of Whitmell, witness was going to school to a Mr. Moran, and was fourteen years old. He boarded at Mr. Harrison's, at death of Whit-

4 s & p.                    38

mell; never saw any negroes at David L's, but Eli, Charity, Tempy, Lewey and Molly, with whom he was well acquainted. Don't recollect that the goods of David L were ever moved to Whitmell's; was frequently at Whitmell's during his last illness

*George Washington*—Value of negroes and hire—in 1824, more valuable than now.

*Drew Champion*—Heard T. B. Whitmell, a number of times, speak of a gift of negroes made to Elizabeth, after she was married; heard him say, he had given to his daughter Elizabeth, Charity, Eli, Sam and Molly; Sam was sold by his father to Whitmell; he saw the negroes at C. David L's, until he left the county—several years after marriage; what makes him recollect about Eli, more particularly, is, that he and Whitmell bought three negroes from a Virginia trader—Eli was one of them.

*Shadrach Bell*—Knew David L and Thomas B. Whitmell; lived in neighborhood; and saw David L married; was often at David L's house, after marriage; saw the negroes, in the deed of gift mentioned, in the possession of David L. Hunted frequently in company with T. B. Whitmell and Mr. Bell; and recollected they breakfasted at David L's once, and perhaps oftener; this was in the summer or late in spring. The negroes were at David L's, shortly after marriage; thinks he has seen them all there; but if they remained there constantly, don't know; don't know if negroes were under control of David L, or not. Don't know of any consideration given by David L, to Thomas and Drew Whitmell, for deed.—Don't recollect that he saw all the negroes at David L's, at one time, in life-time of Whitmell.

*Dr. Isham Sills*—Saw David L and wife at home, shortly after the marriage. Whitmell said, he had given his daughter, Elizabeth, a parcel of negroes, and intended or had given her a tract of land in north-western district; saw the negroes, Sam, Eli, and two negro women and children, that were before the property of Whitmell. Was at David L's, often; knows positively, that the negroes were on his premises, and under his control, in the lifetime of Thomas B. Whitmell; never saw them in the possession or employment of any one else but C. David L, after Whitmell told him he had given them to his daughter, Elizabeth, then wife of C. David L; thinks he saw Whitmell at the house of C. David L; does positively believe, that the negroes remained in the possession of David L, from and after the time that he said he had given them to Elizabeth. Nathan Ross and N. Skinner were at law with J. Jones, and report says, they were very unfriendly to Jones. Elizabeth Jones is dead.

*John Jones*—Knows negroes; saw the negroes all at a time, and several times at David L's. Witness helped to make the coffin of Whitmell; it was made at David L's; all the negroes were then at David L's. Always considered them the property of David L, but after death of Whitmell, heard it circulated that the negroes were only lent to David L; but all those he heard speak on the subject, before the death of Whitmell, considered them as property of David L. Heard Whitmell say, at the house of David L, that he had given the negroes to Elizabeth.

Cross-examined—Saw Dave, another negro of Whitmell's, at David L's, who was hired to Churchill;

may have seen others; the negroes were in possession of David L, when Whitmell said he had given them to his daughter.

*Mary Hodge*—C. David L moved home in the course of the summer; after Mrs. David L moved, often stayed with her two or three days at a time; saw negroes there at times; saw Charity there every time; don't know she saw the rest every time. The negroes remained in possession of David L, from the first time she saw them there, till the death of Whitmell; Sam was bought of her father; set up with Whitmell when he died; witness is forty-one or forty-two years old.

*Henry Hodge*—Lived near Whitmell; David L moved home short time after he was married to Elizabeth; was frequently at David L's, after he moved home; saw all the negroes at David L's; saw them in the employment of David L, and never saw them in the employment of any other person after he moved home, and this was previous to the death of Whitmell; never saw any other negroes in the possession of David L, before death of Whitmell, belonging to Whitmell. Witness is forty-four or forty-five years old.

*Wm. R. Smith*—lived near Whitmell's; a cancer on his tongue caused his death; he set up with him a night about a week before death of Whitmell, and at that time the cancer had cut off much of his tongue, which so affected his speech that he could not understand any thing he said; he made his wants known to his nurse by signs, more than words; neither David L nor Elizabeth were there; in spring of 1825, received a letter from Hogan requesting him to

enquire for information; saw Moran and asked him, if he knew any thing of David L's having any of the negroes before death of Whitmell; Moran said it had been so long since the death of Whitmell, that he did not recollect any thing about it.   In fall of 1826, received a letter from Bell, for information; again saw Moran, and asked him what he knew, and what was the belief in the neighborhood—his answer was, he had just received a letter from Bell, on the same subject, but had no recollection of the circumstances.   Received a letter from Hogan, requesting him to attend and cross-examine Moran, when he was examined: received the letter 19th December, and went on same day while they were examining witnesses for Bell; read Moran's depositions on that day.   In one part he said, all Whitmell's negroes worked in the crop before his death, and after his death; all helped to gather it; asked Moran if he was on the plantation of Whitmell, after his death: he said no; then asked him how he could say, that all the negroes of Whitmell helped to gather the crop—he said he did not intend to say so; then witness applied to S. M. Nickels and Young, the two justices, to put down the questions to Moran, and his answers—they said, Moran's deposition was closed; that they had two others to take, and that they had not time to write it over again; believes it was 3 o'clock in the afternoon.   The crops gathered in North Carolina, at that time, were corn, and middle of October was thought early to begin to gather the crops.

*Drew Champion*—lived near David L; he moved home shortly after the marriage; was frequently at his house after the marriage; frequently saw the ne-

groes there; can't say he saw them there every time he was there; negroes were in the employment and possession of David L, and remained from the time he first saw them there, till death of Whitmell; set up a part of several nights with Whitmell, before he. died; rode with Whitmell to his quarter, several times, and passed David L's house, after David L had moved home. Would have certainly known the names of the negroes if he had not heard them; was born in 1769. John Jones and Henry Hodge married sisters of witness; Sills's wife is cousin of witness; thinks Sills and Jones somewhat related; but don't know what; moved from North Carolina in 1804.

The Chancellor, below, on a final hearing, rendered a decree in favor of the complainants, for the slaves and their increase, together with the value of their hire, from the time of Mrs. Hogan's death.

A writ of error having been taken, and the case removed into this Court: the plaintiff contended for a reversal on the grounds—

1st. That there was a gift of the negroes by Thomas B. Whitmell, in his life-time, to his daughter and son-in-law, Claudius David L, and that the plaintiff in error was entitled to the whole property, under the gift.

2d. That if there had been no gift, and if the plaintiff in error held under the will, that then he was entitled by reason of the deed from Thomas and Drew S. Whitmell,—the death of Thomas West Whitmell—the will of Claudius David L,—the marriage, and death of Mrs. Hogan—to the whole inter-

est, except one fourth, and one sixteenth of the property.

1st. Because the grant from the brothers to Mrs. Elizabeth David L, during the life of David L, vested their rights in him absolutely.

2d. There was a temporary merger of the life estate, and executory fee, in Claudius David L, which by his will was conveyed to his wife.

3d. Whether the property was merged in Claudius David L, or not; and even if the wife, as survivor of Claudius David L, was entitled to the interest granted, by survivorship—still Hogan having married and survived her, was entitled to said interest.

The cause was argued by *Thornton* and *Stewart*, for the plaintiff in error—and *Hopkins*, contra.

SAFFOLD, J.—Thomas B. Whitmell, in the State of North Carolina, made his will on the 26th of February, 1798, and died on the 20th September next, thereafter. He devised, *inter alia*, six negroes, which (with their increase and hire) are the subject of this controversy, to his daughter, Elizabeth, for her natural life, and after her death, to her children, if she should have any, and if not, then over to his four other children—to wit, Ann Smith Whitmell (now Ann S. Bell, the complainant's wife,) Thomas Whitmell, Drew S. Whitmell and Thomas S. Whitmell. The negroes having gone into the possession of Hogan, in the manner herein after stated, the bill was filed by Bell and wife, for their recovery, and the value of their hire, from the death of Elizabeth, the legatee for life.

The material facts, disclosed by the bill, are, that after the making of the will, and before the testator's death, to wit, in May, of the same year, Elizabeth married one David L; during the coverture they received possession of the negroes, and afterwards, in the life-time of David L, one of the executory legatees, Thomas W. Whitnell died intestate, an infant, and without issue; afterwards David L died; during his life, however, two of the said executory legatees, Thomas Whitnell, and Drew S. Whitmell, conveyed, by grant and release, all their said executory interest, to their sister Elizabeth. After the death of David L, and during the widowhood of Elizabeth, Drew S. Whitnell died, intestate, and without wife or children. After the death of said Drew S. Whitmell, the said Elizabeth David L intermarried with the defendant below, Arthur S. Hogan.— And at a still later period Thomas Whitmell died intestate, and without wife or children; and afterwards, on the 26th August, 1824, the said Elizabeth, wife of the defendant, Hogan, died without leaving any child, but leaving Ann S. Bell, the only surviving descendant of the testator, Thomas B. Whitmell—who, with her husband, are administratrix and administrator of Thomas W. Whitnell, and of said Elizabeth Hogan.

The answer of Hogan, as original defendant, resists the recovery, and relies for his defence, upon two distinct grounds: first, a gift from the testator to David L, and his wife, in his life-time; secondly, on the will of Thomas B. Whitmell—the release from Thomas and Drew S. Whitmell, and the will of David L.

The only fact in controversy between the parties was, whether the elder Whitmell, in his life-time, made an absolute parol gift and delivery of the negroes in question, to David L, and his wife; or were they received on the terms expressed in the will?—On this point a large mass of testimony was taken by each party.

The Circuit Court decreed, for the complainants, the negroes in controversy, and four thousand five hundred and seventy eight dollars, the value of their hire, since the death of Mrs. Hogan.

Hogan, having prosecuted this writ of error, assigns, as causes—that the Court decreed for the complainants, as stated, when their bill should have been dismissed. That there was error, in not giving effect to the deed of release, or conveyance of Thomas and Drew S. Whitnell; and in allowing damages for the detention of the negroes.

The whole merits of the case may be sufficiently investigated, by an examination of the two questions, first, was there any parol gift, legally consummated? Secondly, what was the legal effect of the will, as between these parties.

The first question must be governed by the strength of the evidence. The testimony on either side, considered apart from that oppsed to it, would afford reasonable certainty in favor of the party for whom it was introduced; but when compared, it is difficult to be reconciled. Much of the discrepancy has probably arisen from the great lapse of time, thirty years and more, since the happening of the events, concerning which the witnesses have deposed.

4 s & p. 39

So much as relates to the nature of the gift, is, doubtless, attributable, in a still greater degree, to the kindred nature of the facts, which each party has endeavored to prove, that is, whether the gift was absolute or for life only.

Had the question been, whether the original gift was to David L, and his wife, or to Ann S. or any other, less uncertainty or doubt could have arisen in relation to the same acts or expressions. The expression, in the will, that the testator lent the negroes to his daughter, Elizabeth, during her natural life, implies nothing less than that he had given them for the same term, and the latter would have been the most appropriate language. The former must have been used from a motive of extreme caution, that a larger interest should, by no possibility be implied. Yet, admitting that the testator's intentions were always the same, as respected the nature and duration of the gift, it could not be presumed, that he would, in all his subsequent conversations on the subject, have observed the same caution.

It was only when he undertook to explain his will, or to define the limitations of any legacy contained in it, that this particularity could have been expected.

The presumption is conceived to be fully authorised, that Elizabeth and and David L, knew that the will had been written, and were well acquainted with the nature of the legacy to her, before they received the negroes : the fact may also be safely assumed, that Hogan was in possession of the same information, at the time of his marriage : he, at least, had all the necessary means of acquiring it. The

denial, contained in his answer, of a full knowledge of the facts and circumstances, is too vague to be received as an express denial of the fact.

The most dubious point in the evidence, relates to the question, whether David L and wife, had received the negroes, and settled off to themselves, before the death of the old man, Whitmell; or, was this done afterwards?

Many witnesses, on either side, and who are presumed credible, have deposed, with great confidence, in opposition to each other, respecting this fact. But, when it is recollected, that the house built by David L, and occupied by himself and wife, was only about one mile from the residence of his father-in-law, it may be reasonably conjectured, that these negroes, or others—probably some of each—were employed at different intervals, at *each* of the places.—

The period in question was from May, when the marriage took place, until September, when the death occurred. This was a season of the year, during which a crop could not have been commenced—the time while the building was going on; and it may well be inferred, that the same parcel of negroes, may have worked on the buildings, at different intervals, when they could best be spared from the crop. This is the only suppsition on which the conflicting evidence can be reconciled.

Much of the testimony on another point, in relation to which, the witnesses are in apparent conflict, may be reconciled on a similar principle. I allude to the declarations of the testator.

That he was often heard to speak of this gift to his daughter, is fully evident. Some understood him

to say, in general terms, he had given the negroes to
her—others, that he had given them to her for life,
only. The very natural presumption, that he may,
on some occasions have defined the limitations of the
gift, and at other times omitted it, would remove all
the difficulty on this point.

These considerations, connected with the giving
and accepting the release from her two brothers, to
Elizabeth; and the well established fact, that she
and her first husband often admitted that they held
the life interest only, warrant the conclusion, that
the limitation expressed in the will, was intended by
the old man, and that they so understood it, when
they received the negroes; or, if such was not their
impressions, a doubt can scarcely exist, but that, af-
ter the death of the father, they acquiesced in the li-
mitation, and admitted that their title was subject to
it for many years, and never asserted the contrary du-
ring their lives.

Then, conceding the principle contended for in the
argument, and heretofore recognised by this Court,
that, whenever, on the marriage of a daughter, the
father sends a portion of his property, or permits it
to go into the possession of his son-in-law, and to be
held and used for a time, by the married couple, as
their own—the father having spoken of it, as a gift,
the law implies a transfer of the right, and vests the
title in the son-in-law, in consideration of the mar-
riage; also that the subsequent declarations of the
donor to the contrary, are inadmissible as evidence,
against the right, as was ruled in *High* vs. *Stainback;*[a]
yet, this case is different. The existence of the will,
and probable acceptance of the property under it;

*1 Stew.24

or at least the full acquiescence of the donees, after-wards, in the terms thereby declared, excludes the presumption of any other right. Hence we conclude, that the alleged parol gift has not been established by the proof; and that, on this point, there was no error in the opinion of the Circuit Court.

On the other point, relating to the effect and con-sequences of the limitations of the will, and the events mentioned as having subsequently occurred, we have felt more difficulty. It involved much of the legal intricacy and refinement, concerning vested and contingent remainders, and executory interests, which are of rare occurrence. In the investigation of this doctrine the counsel have evinced equal zeal, talent and depth of research: their positions and il-lustrations have been duly considered.

In favor of Bell and wife, it is contended, that the death of Hogan's wife, without issue, being the only event that could vest any interest in her brothers; and as Hogan claims in right of his deceased wife, by descent from one of the brothers, and a release from the others, these rights could not be reduced in-to Hogan's possession, during the coverture ; and that without such possession, he could acquire no right to his wife's choses in action : that, neither by the common law, or statute of this State, was he entitled to the administration of his wife's estate; and if he were, that right could confer no title to the choses in action ; but he would only recover and hold them, for the benefit of her heirs at law.

On the part of Hogan, it is admitted, that his claim can only be sustained on the principle, that the con-tingent interest created by the will in favor of Eli-

zabeth's brothers, was extinguished and discharged by the death of one, and the release of the other two, to her, during her life—so as to convert her limited estate, (in proportion to these interests,) into an absolute one; that the contingent bequests were both assignable and transmissible by descent; and under these titles Hogan held that portion of the property in his own and his wife's absolute right, which was a sufficient legal possession.

The soundness of the position, that, to consummate the husband's title to his wife's choses in action, he must. during the coverture, have reduced them into possession, is not now to be questioned, in this Court. We so ruled in the case of *Mayfield, guardian, &c.* vs. *Clifton*, and previously in *Johnson, adm'r* vs *Wren.* see, also, *Wallace et ux.* vs. *Taliafero et ux.*[a] and *Baker* vs. *Hall.*[b]

*2Call, 447
*12 Vesey,
497

It is not sufficient, that he should have held as guardian, executor, or other trustee or agent—he must have possessed the property, *quasi husband,* for himself and wife.

But, as respects the two shares, released by the two brothers of Elizabeth, and a portion of the interest of the other, who had previously died, was not Hogan, before the death of his wife, in actual possession, under claim of individual right? He surely held and used the property, under an assertion of his title in right of his wife; and, as to these portions, it may fairly be presumed, he considered them no less his own, than if so much of the original legacy had been absolute to Elizabeth, his wife.

But, could the contrary be supposed, that, in fact, he considered his interest limited to the life-time of

his wife, or that he had doubts as to the law of the
case; yet he held the property by an absolute or li-
mited title, *as his own,* so long as it could exist—and
such would appear to have been a sufficient legal pos-
session. There were no means, by which he could
change the nature of his possession; even as respects
his wife's right, by descent, to the parts claimed, of
her deceased brother, (Drew S. Whitnell's) interest,
there was no authority, while it rested on the contin-
gency for an administration thereon—there was no-
thing certain or tangible on which to operate. Hence
it results that David L, in his life-time, and afterwards
Hogan, were successively in legal possession, as the
sbands of Elizabeth, of the portions referred to; pro-
vided these interests were legally transmissible by des-
cent from the one, and assignable by the deed of the
other two: these latter questions will be farther con-
sidered. But this contest having been previously before
this Court, in a suit at law, some of the principles in-
volved, were then sufficiently determined, to obviate
the necessity of a farther investigation of them, at
present. The questions then raised, related mainly
to the construction of the will; and the validity of
the limitations as therein declared. We there ruled,
that the contingent interests, or limitation over to the
brothers and sister of Elizabeth, in the event provi-
ded for was not too remote, but was good in law;
also, that an interest depending on a contingency,
not in the discretion of any one, was assignable by
the executory legatee in his life-time, or if not so as-
signed, was descendible, on his death, to his legal re-
presentative. This decision is still believed to be
sustainable on authority, and it greatly narrows the

ground of our present investigation. A slight additional reference to authorities, will serve to illustrate the doctrine.

a Cited in 2 Fearne on Devises 531-2.
In the case of *King* vs. *Withers*,[a] the testator had devised land to his son B, with condition, that if he should die without issue male of his body, then living, or which might be afterwards born, that then his daughter should receive, at her age of twentw-one or day of marriage, which should first happen, the sum of thirty-five hundred pounds; but in case the contingency of his said son's dying should not happen before his daughter's said age or marriage, then she should receive that sum, whenever such contingency might happen : and he charged the legacy on his real estate. The daughter married, having attained her age of twenty-one, and died in the lifetime of her brother B., who afterwards died without issue, male. Lord *Talbot* decreed that the legacy should be raised for the benefit of the administrator (the husband) of the daughter; and he held, that though it did not absolutely vest, because it might never arise, yet it so far vested, as to be transmissible to the representative; which decree was affirmed
b 2 Wilson 29, cited in 2 Fearn on D. 534.
in the House of Lords. In *Goodright* vs. *Searl*,[b] the subject of which was strictly an executory devise, the right in controversy depended on a contingency similar to that in the former case, but was decided on a different principle. There, the Court recognised the rule, that one who claims a fee simple, by descent from one who was the first purchaser of the reversion or remainder, expectant on a freehold estate, must make himself heir to such purchaser, at the time when the reversion or remainder falls into pos-

session. This decision is believed to rest on the strictness of the rule referred to. In that case, the Court refused to recognise the principle contended for, that the executory fee, on the death of the executory devisee, before the happening of the event which was to determine the right to it, could create a merger of the fee in the limited estate. In reviewing the case, *Fearne* remarks, " how wsa it possible for it (the executory fee) to merge before it had any existence? If it could be extinguished by merger, it must be by its union with a greater estate out of which it was to arise, and of which it might be considered as a part, or at least as an extraction. But how are two estates to unite, or one to become blended and confounded with, or absorbed in the other, when both are of equal measure, viz : both fee simples; and of which one can not commence or partake of existence at all, but in an event which destroys and annihilates the other ?" To this application of the rule or cannon of descent, confining the inheritance to the line of the first purchaser of lands; and to the reference of the right to the time when the reverson or remainder falls into possession, there may be no objection. Nor would I dissent from this technical doctrine of merger, in reference to real estates; but I can not consider it decisive of the question before us, or justly applicable to executory bequests of personal property.

The same learned jurist, in his several treatises on executory interests, has reviewed most of the doctrine in a very satisfactory manner. He maintains,[a] that though the first taker can not destroy or disappoint

[a] Fearne on R. 423.

4 s & p.                40

the ulterior executory interest, yet "that a release from the person decidedly entitled to the future executory interest, unto the first taker entitled to and in possession of the antecedent limited interest, will discharge that future executory interest.[a] Again, the same author says, " there still remains another property of executory devises, to be taken notice of, which belongs to them in common with contingent remainders; what I mean is, that an executory interest, whether in real or personal estate, is transmissible to the representative of the devisee, when such devisee dies before the contingency happens; and if not before disposed of, will vest in such representative when the contingency happens." Also he says, " I have, in a former part of this treatise, observed, that contingent estates in lands of freehold or inheritance are not devisable, i. e. whilst they are contingent.— But it is otherwise in regard to contingent or executory interests in terms or other personal estates. It appears indeed, that at common law, a possibility has been held not to be devisable; though a distinction in this respect, it seems, has been taken between interests in contingency, and naked possibilities.— Nor was a possibility assignable, though it might be released in certain cases; but, however, there are many determinations by the Court of Chancery, which prove, that at this day, possibilities of personal estates are devisable, as well as assignable in equity."[b]

In *Barnes* vs. *Allen*,[c] a bequest had been made of the residue of the testator's personal estate to his wife, for life; but if she should die, without issue living at her death, then to testators two brothers, or if

[a] Lampet's Case 10; Coke's R. 46, b.

[b] 7 Vesey 300.

[c] 1 Brown's Ch. R. 181

one of them should be dead, then to the survivor. They both having died in the life-time of the wife, it was held, that the legacy had vested in both the brothers, as joint tenants, and must descend to the representative of the survivor. In the decision of this case, the Lord Chancellor remarked, " a contingent interest may vest in right, though it does not in possession. I take it to be clear, that if a testator gives a legacy upon a contingency, unless the contingency happens, the legacy does not vest; but the case of an executory devise, is, that the interest of the first taker and that of the subsequent taker, vest at the same time. Contingent or executory interests may be as completely vested as if they were in possession."

One other case may be noticed, *Pinbury* vs. *Elkin.*[a] [a] 1 Prince Wms. 356. It was very similar to the last referred to—a bequest had been made of eighty pounds, to the testator's wife, with a proviso, that should she die without issue by him, then, after her death, the legacy to go to his brother. After the testator's death, the brother died in the life-time of the widow, who afterwards died without leaving any issue. The Court held, that this possibility devolved to the executors of the brother, though he died before the contingency happened.

I decline a farther review of the numerous authorities cited on either side; the full discussion of them in argument, and our subsequent examination, have satisfied us, that the true doctrine to be extracted from them all, is that maintained by the cases I have noticed. But further to test the effect of an assignment of an executory interest, before the event has

happened, on which it depends, it may be useful to suppose the case suggested in argument—that all the executory legatees had released their interests to their sister Elizabeth, or to her and either husband in her life-time. In such case it would appear impossible to doubt, but that the future contingent interests would have been extinguished and discharged; and that Elizabeth's bequest would have been relieved of the limitation expressed in the will, and the same have been converted into an absolute estate in herself and husband. A similar discharge of the limitation must also have been the consequence of the death of her sister and all her brothers, during her life-time. If in this way a total extinction or discharge of the executory interest would have been effected, parts of the same were equally liable to be discharged and united in the limited estate, from like circumstances.

Then admitting the principle contended for in argument, that neither David L or Hogan, as husband of Elizabeth, was, by the common law, or any statute of this State, respecting distribution, entitled to her choses in action, not reduced to possession during coverture; yet this admission does not affect the right now claimed in favor of Hogan. As already remarked, he is conceived to have had and enjoyed for his own benefit, during coverture, all the possession of which the property in question was susceptible; and that we regard as a legal possession, as well of the released interests, as of the part claimed by descent. And as was said in our previous decision on the subject of this suit, to authorise a recovery of any part of this inheritance, in a suit at law, the right

must have been established through the representative of the deceased, Drew S. Whitmell; yet this principle does not affect the right of Hogan, under his former possession, to retain so much thereof, as by law he is entitled to; especially when litigating the right with one having the administration of that estate.

From these views of the case, we are of opinion, that the decree of the Circuit Court was erroneous; that Hogan, plaintiff in error, was and is entitled to retain, as his own, all the property in question, and now in existence, (being the surviving negroes and their increase,) except one fourth and one sixteenth (in other words five sixteenths) thereof; that this latter proportion of the property, constituting the original contingent bequest to Ann S. Bell, and her distributive share of the portion of Drew S. Whitmell, deceased, together with an equitable rate of hire, in proportion to their division of the negroes, the complainants are entitled to recover. But the testimony taken may not afford all the requisite information, on which to found the final decree; at least we consider it necessary, that a master in chancery or commissioners, to be appointed by the Circuit Court, should first make an examination, and report on the subject.

We, therefore, reverse the decree, and remand the suit, that the Circuit Court may carry into effect, the principles of this decision, as herein declared.

LIPSCOMB, C. J., not sitting.